# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF INDIANA
# INDIANAPOLIS DIVISION

| | |
|---|---|
| CHERYL MCCLENDON, | ) |
| Plaintiff, | ) Cause No. 1:23-CV-1933-JPH-MG |
| v. | ) |
| INDIANA MEMORIAL AND CREMATION SERVICE, INC. and ROBERT E. LAMON, | ) |
| Defendants. | ) |

## FIRST AMENDED COMPLAINT

Plaintiff, Cheryl McClendon, by counsel, Christopher C. Myers, within the time allowed by the Proposed Case Management Plan (DE 11), alleges against the Defendants as follows:

1. The Plaintiff is Cheryl McClendon, a resident of Marion County Indiana at all material times to this Complaint.

2. Defendant Indiana Memorial and Cremation Service, Inc. is a corporation authorized to do business in the State of Indiana, and an "employer" for the purposes of the Equal Pay Act, 29 U.S.C. § 206(d).

3. Defendant Robert E. Lamon is believed to be the Owner of Indiana Memorial and Cremation Service, Inc., and is being sued as an individual whose actions and conduct towards Plaintiff makes him liable under state law theories of intentional infliction of emotional distress and negligent infliction of emotional distress (his conduct is described in the attached Charge of Discrimination, attached as Exhibit "A").

4. Plaintiff was employed by Defendant from around April 1, 2022, until her constructive discharge on May 23, 2022. She was hired by the Defendant's owner,

1

who was actively involved in the day-to-day operations and management of the Defendant company at all material times. At all material times to the Complaint, Plaintiff performed within the reasonable expectations of the Defendant, and held the position of Funeral Director at the time of separation from employment.

5. When Plaintiff was hired, she was told that she would be paid at the rate of $22.00 per hour, which is the same as what the male funeral directors were paid.

6. On Plaintiff's second day of work, while filling out her W-2 form for the Defendant, Plaintiff saw on her payroll sheet that Respondent was paying her $15.00 less per hour than a male Funeral Director.

7. The next day, Plaintiff confronted Mr. Lamon about this pay disparity and the fact that the male funeral director did not hold a current license in Indiana and had only been employed since three weeks prior to Plaintiff's hire. In contrast, Plaintiff had been a licensed Funeral Director for forty-two (42) years, held a current and active license, and a college degree.

8. Defendant's owner informed Plaintiff that the same male Director also gets perks of $37.00 per hour plus a company vehicle, but did not explain the reason for the better pay and perks similarly situated male funeral director received.

9. After Plaintiff was on her fifth day of work, she learned that a male Director at another of the Defendant's locations, was getting perks with the company in spite of only having had an applicable license for a short period of time, and employed with the company for only three (3) years, and that individual was also being paid $40.00 per hour and a company vehicle to use.

10. Shortly thereafter, Plaintiff learned that she was the only Funeral Director at the Defendant's location on 10th Street in Indianapolis who had a current Funeral Director license.  Furthermore, she learned that the particular location where he worked was on probation.  Additionally, another male Funeral Director had a license that was on inactive status for the State of Indiana.

11. Plaintiff claims that Defendants are liable to her for the negligent infliction of emotional distress and intentional infliction of emotional distress, and in furtherance thereof would state:

    a.  In addition to being paid less than similarly situated and less qualified male Funeral Directors, Plaintiff was subjected to sexual harassment by the Defendant and its owner.  On her second day of work, Plaintiff was called into the owner's office, at which time the Defendant's owner asked the Plaintiff "do you like me?"  To which Plaintiff responded, she didn't know him.  He then told Plaintiff that she was "overdressed".  That same comment was repeated thereafter on daily basis.

    b. On Plaintiff's third day of work, the owner called her back into his office.  Once in the office, the owner proceeded to inappropriately comment to the Plaintiff that she was "a good-looking woman", "beautiful", and that the glasses she wears make her "more sexy".  He also told her not to fix "that gap in your teeth, it's sexy and don't change it".  This unwanted and sexual attention and commentary about the Plaintiff's looks was inappropriate and offensive and would be to any other reasonable employee in her shoes.

    Plaintiff informed the owner that she was not working there to be the recipient of such comments, and that they were inappropriate.

c. The next day, the owner told Plaintiff to "wear some perfume", and that "he better like it". He also informed Plaintiff that he had found out he would be going to the Senior Expo the following day and asked Plaintiff if she wanted to go as well. The Plaintiff said "sure".

d. Prior to this, Plaintiff had requested a copy of the Defendant's Employee Handbook but had not been provided with one. Plaintiff asked the owner what the office protocol was, and if could she have a copy of the Employee Handbook. Instead of assisting, the owner then verbally attacked the Complainant, now telling her that she was "overdressed" and "too professional". Plaintiff politely reminded him that because she was a Funeral Director, and conservative attire was appropriate for her position.

e. Later the same day the owner approached the Complainant and stated loudly to her "you're not telling me anything ". When the owner asked Plaintiff to inform him about other employees' activities. The Plaintiff let the owner know in front of two coworkers that were nearby, that she was trying to learn Defendant's system, and help families who had lost loved ones, and she did not want to tell on anyone; the owner then stormed out of the office.

f. On the day of the senior expo event, Plaintiff arrived at work around 8:30 a.m., and discovered that the two male Directors, Byran and Dan, had already left their homes in company vehicles to go to the event, at least according to Mr. Lamon. Mr. Lamon walked into the office, and asked Plaintiff if she was

4

    ready to go; and Plaintiff realized he obviously wasn't yet on his way to the expo event, so she decided to ride to the Expo with him.

g. While Plaintiff was in the breakroom that morning, Mr. Lamon entered and began showing Plaintiff photos from his wallet, which showed him dressed in a wig and a dress at the age of 9 years old, then but with another picture of himself when he was adult, but again dressed like a woman.

h. While Plaintiff rode to the expo with Lamon, he began telling her that his mother's best friend "turned him out" when he was 14 years old [meaning the woman had sex with him/molested him] and that according to the owner, he "knew how to satisfy a woman".  Plaintiff was speechless and told Lamon she really didn't want to hear that, or any more of that sort of talk.  The owner responded, "you don't like me?"

i. In a desperate effort to try to change the subject, Plaintiff asked Lamon if he had an Employee Handbook.  Although he said yes, he promptly went back to the offensive subject, and began prattling on that he liked "older women", and that his wife was "older".  Being again very offended, and now also concerned about her own wellbeing given that she was still in a moving vehicle with Defendant, the Plaintiff grabbed her cellphone and dialed her husband as Lamon talked on.  Her husband and she both then listened as Lamon talked about how Plaintiff could drive the company van home after the expo, and Lamon would put a clean cotton sheets in it.  Evidently, he could see Plaintiff's visible disapproval, so he quickly began apologizing.  Plaintiff then

      hung up the phone and told Lamon that her husband had heard what had been saying.

j. When the owner and Plaintiff arrived at the expo, Plaintiff got out and attempted to walk quickly away from him.  At the end of the expo, in order to further avoid any further offensive and sexually harassing conversation from Lamon, Plaintiff rode back to work with her coworker Bryan Hutchinson in his company vehicle.

k. Other repeated instances of verbal sexual harassment occurred.  Plaintiff was subjected to numerous offensive and harassing sexual comments and propositions from Lamon.  Plaintiff repeatedly rejected his advances, and repeatedly reminded him she was married.  Lamon he typically became hostile towards Complainant in response.

l. On the day after the expo, Mr. Lamon called Plaintiff into his office, and told her "It's not a good fit" in reference to Plaintiff's employment with Defendant.  Being fed up with the ongoing sexual harassment, Plaintiff replied that "no its not".  Mr. Lamon then handed Plaintiff her paycheck, and after she gathered her belongings, she left the building, and didn't return.

12. Plaintiff contends that the conduct described above (and stated in the attached Charge of Discrimination) establishes that Plaintiff was subjected to the negligent infliction of emotional distress and the intentional infliction of emotional distress by the Defendants, and each of them.  Defendants' conduct was the direct and proximate cause of the Plaintiff experiencing mental anguish and emotional distress on the job to the point where she experienced such hellish behavior that she had no other choice

      but to resign and suffer the loss of her job and job related benefits including income, as well as experiencing severe emotional distress, mental anguish, inconvenience, humiliation, embarrassment, and other damages and injuries.

13. Defendants' discriminatory pay to the Plaintiff was an intentional and knowing violation of the Equal Pay Act, 29 U.S.C. § 206(d).  Plaintiff, a female employee, was receiving substantially less wages than male employees when both Plaintiff and the similarly situated males were performing substantially equal work at the same establishment and under similar working conditions.  Plaintiff is entitled to pecuniary damages, liquidated damages, and reasonable attorney's fees and costs.

14. Plaintiff contends that Defendants violated her right to publicity without her consent by using her photograph and likeness in advertising and marketing materials after she left the employ of Indiana Memorial and Cremation Service, Inc. and after she advised Defendants to stop using her image, all in violation of I.C. § 32-36-1-1 *et seq*.  Defendants are liable to the Plaintiff for actual damages, and/or damages in the amount of $1,000.00 per violation, as well as treble or punitive damages.  I.C. § 32-36-1-10 *et seq*.  Plaintiff is also entitled to an award of attorney's fees and expenses.  I.C. § 32-36-1-12 *et seq*.

    WHEREFORE, Plaintiff prays for judgment against the Defendants, and each of them, for pecuniary damages, compensatory damages, punitive damages, treble damages, liquidated damages, reasonable attorney's fees and costs (where available), and for all other just and proper relief in the premises.

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action.

Respectfully submitted,

**MYERS & WALLACE, LLP**

/s/ *Christopher C. Myers*
Christopher C. Myers, #10043-02
809 South Calhoun Street, Suite 400
Fort Wayne, IN 46802
Telephone:   (260) 424-0600
Facsimile:    (260) 424-0712
E-mail:    cmyers@myers-law.com
Counsel for Plaintiff